1

2

3

4

5

6

7

8

9

10

11

12

13

14

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

STEPHAN HAASE,                                )
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )          3:09-cv-636-RCJ-WGC
                                              )
                                              )          **ORDER**
CITY OF SPARKS, a municipal corporation,      )
ANDY FLOCK, an individual,                    )
                                              )
            Defendants.                       )
                                              )
_____       )

15      This case involves alleged acts of retaliation against a local firefighter for exercising his

16  First Amendment rights.  His employer, the City of Sparks, and the head of the fire

17  department, Fire Chief Andreas Flock (collectively "Defendants") have filed a motion for

18  summary judgment (#35).  For the reasons stated below, Defendants' motion for summary

19  judgment is granted in part and denied in part.

20                                    **BACKGROUND**

21      Plaintiff Stephan Haase was a firefighter with the City of Sparks Fire Department from

22  1999 through 2009.  (Am. Compl. (#20) at 1).  On August 28, 2007, Plaintiff learned from his

23  best friend, Adrian Leasure, that Captain Mark Rumble of the City of Sparks Fire Department

24  had been arrested on charges of child endangerment for supplying Leasure's infant daughter

25  with the drug "ecstasy."  (Haase Dep. (#35-1) at 12-19).  Plaintiff then wrote two anonymous

26  letters detailing the facts of Captain Rumble's arrest: one intended for the media and the

27  second intended for Fire Chief Andreas Flock, the Sparks City Attorney, and the Sparks City

28  Manager.  (*Id.* at 23-26; Ex. 11 (#35-4)).

        Sometime before 10:34 a.m. on August 29, 2007, Plaintiff approached his supervisor,

1  Captain Quick, and requested the use of a brush truck.[1]  (Haase Dep. (#35-1) at 33-34, 45).

2  Plaintiff told Captain Quick that he had some errands to run, such as going to City Hall to

3  discuss a work-related promotional testing process with city employee Jennie Lewis, getting

4  fuel, and obtaining supplies from Station 1 for Station 4.  (*Id.* at 34; Investigative Hearing (#35-

5  9) at 27; Ex. 11 (#35-4)).  Defendants claim Plaintiff lied to Captain Quick by not stating that

6  Plaintiff intended to also go to Kinkos to fax one of the letters he wrote to the media.  (Mot. for

7  Summ. J. (#35) at 2).  Plaintiff however claims he informed Captain Quick he intended to stop

8  at Kinkos, although this statement conflicts with his deposition testimony.[2]  Plaintiff drove the

9  brush truck to Kinkos and faxed a copy of his letter along with Rumble's booking report to the

10  media.  (Haase Dep. (#35-1) at 34).  He later drove to Sparks City Hall and while there used

11  the inter-office mail room to mail another copy of the letter and the booking report to the

12  Sparks City Manager, the Sparks City Attorney, and Chief Flock.  (*Id.*; Ex. 11 (#35-4)).

13      At 4:04 p.m. that same day, Fire Chief Flock sent an email to the entire fire department

14  informing them of Captain Rumble's arrest.  (Ex. 7 (#35-4)).  Chief Flock also stated he would

15  continue to offer support to Captain Rumble and asked employees to refrain from making

16  comments to the media.  (*Id.*).  Chief Flock learned later that day that an anonymous letter had

17  been mailed from City Hall and another had been faxed to the media, and Chief Flock ordered

18  Division Chief Frievalt to conduct an investigation, allegedly for the purpose of determining

19  whether city or departmental rules had been violated.  (Flock Dep. (#35-10) at 11, 16, 20;

20  Finley Dep. (#35-10) at 21).

21      On September 5, 2007, Plaintiff was interrogated for seven hours by Division Chief

22  Frievalt and this interrogation continued on September 6, 2007.  (Declaration (#38-3) at 2).

23

24      [1] A "brush truck" is a specialized fire apparatus used to fight wildfires as opposed to a

25  fire apparatus which is used to fight structural fires. (Mot. for Summ. J. (#35) at 2 n.2).

26      [2] *Compare* Declaration (#38-3) at 3 (claiming Captain Quick was told Plaintiff was going

27  to Kinkos) *with* Haase Dep. (#35-1) at 34, 35 (claiming Plaintiff did not tell Captain Quick he

28  would stop at Kinkos).

An investigative meeting was conducted on September 17, 2007, at which Plaintiff admitted to distributing the letters. (Investigative Hearing (#35-9) at 21; Haase Dep. (#35-1) at 35-37). On October 23, 2007, Plaintiff received a pre-disciplinary hearing notification letter, alleging Plaintiff may have violated four specific City of Sparks Administrative Rules, Civil Service Regulations and Sparks Fire Department Rules. (Ex. 12 (#35-4); Syverson Dep. (#35-11) at 7-8). A pre-disciplinary hearing was conducted on November 7, 2007, at which Chief Flock presided, and a formal disciplinary hearing was conducted on November 16, 2007. (Ex. 12 (#35-4); Ex. 13 (#35-4)). The ultimate decision on whether Plaintiff would be punished and what that punishment would be was left to Chief Flock. (Syverson Dep. (#35-11) at 24). On November 21, 2007, Chief Flock issued his written disciplinary findings, in which he found Plaintiff had been "not forthcoming" in violation of Administrative Rule 3.010 and that he improperly used a fire apparatus for unofficial business. (Ex. 13 (#35-4)). Plaintiff was given a written reprimand for violating the above rules. (Am. Compl. (#20) at 2).

In December of 2007, Plaintiff took annual leave and sick leave and did not return until March or April of 2008. (Ryback Aff. (#35-11); Am. Compl. (#20) at 2). Prior to that time, Plaintiff worked at Station 4, which performed annual testing of the fire department's self-contained breathing apparatus ("SCBA"). (Mot. for Summ. J. (#35) at 12). This testing had to be done by a person with specialized training and individual certification. (*Id.*). Not knowing when Plaintiff would return, Battalion Chief Gene Rybak transferred another firefighter with the required SCBA training and certification from Station 1 to Station 4 to fill in for Plaintiff and ensure the SCBA testing would be completed on schedule. (Ryback Aff. (#35-11)). When Plaintiff returned to work in March or April of 2008, Ryback reassigned him to Station 1 to replace the previously transferred firefighter. (*Id.*). Plaintiff admits he suffered no loss of pay or benefits, but alleges that Station 1 was a "rookie assignment." (Declaration (#38-3) at 3).

In July of 2008, ten candidates—including Plaintiff—were interviewed for five fire apparatus operator positions. (Ex. 39 (#35-7)). The interview panel consisted of Division Chief William Finley, and Captains Michael Upson, Barry Hagen and Eric Millette. (*Id.*). Plaintiff was not chosen for the position, allegedly because he had sent the letters nearly a

1  year earlier.  (Am. Compl. (#20) at 3).

2         On July 17, 2008, Chief Flock requested updates for the physical addresses of Sparks

3  Fire Department personnel.  (*Id.*).  Plaintiff updated his address to 153 Juniper Drive, Stateline,

4  Nevada 89449.  (*Id.*).  Administrative Rule 3.1.2 states all firefighters must live within 45

5  minutes of the nearest City of Sparks fire house to ensure that off-duty personnel are available

6  in case of a significant fire or event.  (Ex. 42 (#35-7); Flock Aff. (#35-11)).  The allowed travel

7  time was later increased to 60 minutes by Chief Flock on December 6, 2007.  (Ex. 43 (#35-7)).

8  Based on an internet search, Chief Flock believed Plaintiff's updated residence was located

9  more than 60 minutes away in violation of the rule, and directed Plaintiff to provide proof of

10 compliance within 12 months.  (*Id.*).  On August 19, 2009, Plaintiff provided directions from his

11 home in Stateline, Nevada to the nearest fire house allegedly printed from Yellopages.com.

12 (Ex. 44 (#35-7) at 23-25).  Based on inconsistencies in the proof of compliance provided,

13 Plaintiff was issued a written reprimand on September 4, 2009 and given an additional six

14 months to comply with the rule.  (Flock Dep. (#35-10) at 39; Ex. 46 (#35-7)).  Rather than

15 submit further proof of compliance, Plaintiff applied for the City's "Voluntary Separation

16 Program" under which Plaintiff received a 75% buyout of his base salary.  (Ex. 52 (#35-7)).

17 Plaintiff no longer works for the City of Sparks Fire Department.

18        Plaintiff filed this complaint against the City of Sparks and Chief Flock, alleging: (1)

19 adverse employment actions reasonably likely to deter a person from engaging in a protected

20 activity under the First Amendment by Chief Flock in violation of 42 U.S.C. § 1983; (2) violating

21 Plaintiff's constitutional rights pursuant to a policy of the City of Sparks; (3) wrongful

22 interference with Plaintiff's rights under the Family Medical Leave Act; (4) adverse employment

23 actions against Plaintiff in violation of his right to equal protection under the law; and (5)

24 negligent hiring and supervision.  (Am. Compl. (#20) at 4-6).  Plaintiff later voluntarily

25 dismissed all causes of action except for the claims that Chief Flock and the City of Sparks

26 violated 42 U.S.C. § 1983 by engaging in adverse employment actions reasonably likely to

27 deter a party from engaging in his First Amendment rights.  (Opp'n to Mot. for Summ. J. (#38)

28 at 15).

4

1  Defendants filed a motion for summary judgment on June 16, 2011.  (Mot. for Summ.
2  J. (#35)).    Defendants assert they are entitled to summary judgment because "the
3  uncontroverted evidence demonstrates that Plaintiff's constitutional rights were not violated."
4  (*Id.* at 3).  They also claim that summary judgment is appropriate because the City of Sparks
5  cannot be liable under a theory of respondeat superior and because Chief Flock is entitled to
6  qualified immunity on Plaintiff's claims.  (*Id.* at 15-20).

## LEGAL STANDARD

7
8  The purpose of summary judgment is to dispose of factually unsupported claims and
9  defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  A court must grant
10  summary judgment when "the movant shows that there is no genuine dispute as to any
11  material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).
12  A fact is material if it may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477
13  U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence
14  for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

15  When presented with a motion for summary judgment, the court employs a burden-
16  shifting analysis.  When the moving party would bear the burden of proof at trial, it must
17  present evidence "which would entitle it to a directed verdict if the evidence went
18  uncontroverted at trial." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d
19  474, 480 (9th Cir. 2000) (citations omitted).  In such circumstances, "the moving party has the
20  initial burden of establishing the absence of a genuine issue of fact on each issue material to
21  its case."  *Id.*  In contrast, when the nonmoving party would bear the burden of proving the
22  claim or defense, the moving party may satisfy its burden in two ways: (1) by presenting
23  evidence which negates an essential element of the nonmoving party's case; or (2) by
24  demonstrating that the nonmoving party has failed to make a showing sufficient to establish
25  an essential element to that party's case on which that party would bear the burden of proof
26  at trial.  *See Celotex Corp.*, 477 U.S. at 323-24.  If the moving party fails to satisfy its initial
27  burden, the court must deny the motion for summary judgment and need not consider the
28  nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

1   If the moving party meets its initial burden, the burden will then shift to the opposing

2   party to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co.*

3   *v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To show a genuine issue of material fact,

4   the opposing party is not required to establish a material issue of fact conclusively in its favor.

5   Rather, it is sufficient that "the claimed factual dispute be shown to require a jury or judge to

6   resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

7   *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quoting *First Nat. Bank of Ariz. v. Cities*

8   *Serv. Co.*, 391 U.S. 253, 288-89 (1968)).  In essence, the nonmoving party cannot avoid

9   summary judgment by solely relying on conclusory allegations that are unsupported by factual

10  data.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  The opposition must go beyond

11  the allegations and assertions of the pleadings and set forth specific fact by providing the court

12  with competent evidence that establishes a genuine issue for trial.  Fed. R. Civ. P. 56(e);

13  *Celotex Corp.*, 477 U.S. at 324.

14      At the summary judgment stage, the court is not to weigh the evidence and determine

15  the truth, but rather to determine whether there is a genuine issue for trial.  *See Anderson*, 477

16  U.S. at 249.  The evidence of the nonmovant must be believed, and all justifiable inferences

17  drawn in his favor.  *Id.* at 255.  If the evidence of the nonmoving party is simply colorable or

18  it is not significantly probative, summary judgment may be granted.  *See id.* at 249-50.

19                              **DISCUSSION**

20  **I.    Municipal Liability**

21      Before delving into the substance of Plaintiff's claims, the Court must first determine to

22  what extent the City of Sparks may be held liable for the actions of its employees.  A

23  municipality may not be liable under 42 U.S.C. § 1983 under a theory of respondeat superior.

24  *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978).  A plaintiff who seeks to impose

25  liability on a local government under § 1983 must prove that an "'action pursuant to official

26  municipal policy' caused their injury."  *Connick v. Thompson*, --- U.S. ----, 131 S.Ct. 1350, 1359

27  (2011) (Citing *Monell*, 436 U.S. at 691).  "Official municipal policy includes the decisions of a

28  government's lawmakers, the acts of its policymaking officials, and practices so persistent and

6

widespread as to practically have the force of law." *Id.*

Plaintiff has provided no evidence that the City of Sparks has any policy in place that would impede the constitutional rights of its fire department employees. Plaintiff only claims the City of Sparks is liable because a policymaking official of the City (Chief Flock) acted to deprive Plaintiff of his constitutional rights. (Opp'n to Mot. for Summ. J. (#38) at 14-15).

Although a municipality may not be liable under a theory of respondeat superior, "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). In *Pembaur v. City of Cincinnati*, the Supreme Court held that a county prosecutor was acting as the final decisionmaker for the county when he ordered deputy sheriffs to forcibly enter petitioner's clinic in violation of his Fourth Amendment rights, and therefore the municipality could be liable for the county prosecutor's actions. *Id.* at 484-85. The Court reasoned that, "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.* at 481. Municipal liability may therefore arise from "a course of action tailored to a particular situation and not intended to control decisions in later situations," provided that "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.*

Whether a particular official has final policymaking authority is a question of state law. *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992). The Administrative Rules of the City of Sparks allows for specific agencies and departments to develop department-specific policies. (Ex. 55 (#35-8)) (allowing for disciplinary action for, among other things, the violations of "City rules and regulations or Administrative Rules including department-specific policies"). Defendant Flock, as Fire Chief for the City of Sparks, had the final say on fire department operating procedures and policies. (Flock Dep. (#38-2) at 39-40). Chief Flock was also given authority to discipline employees and was the final decisionmaker with regard to disciplinary actions. (Ex. 55 (#35-8); Syverson Dep. (#35-11) at 6). Because Chief Flock had been delegated decisionmaking authority by the City of Sparks regarding disciplinary matters within

7

1   the fire department, he was a policymaking official with regard to fire department policies.  The
2   City of Sparks may therefore be liable for Chief Flock's actions in punishing Plaintiff for
3   exercising his First Amendment rights.  The City of Sparks however is entitled to summary
4   judgment to the extent Chief Flock did not participate in the alleged violation.

5   **II.       Plaintiff's Retaliation Claims**

6          Plaintiff's only claim against Defendants is for First Amendment retaliation in violation
7   of 42 U.S.C. § 1983.  The Ninth Circuit employs a five prong test to determine these claims,
8   considering: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the
9   plaintiff spoke as a private person or a public employee; (3) whether the plaintiff's protected
10  speech was a "substantial or motivating factor" in the adverse employment action; (4) whether
11  the state had an adequate justification for treating the employee different from other members
12  of the general public; and (5) whether the state would have taken the adverse employment
13  action even absent the protected speech. *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

14         Defendants do not contend that the matter was not one of public concern (prong one),
15  that Plaintiff spoke as a public employee (prong two), or that the adverse employment action
16  would have occurred absent the protected speech (prong five).  Defendants chiefly argue that
17  (1) there was no adverse employment action motivated by Plaintiff's protected speech under
18  the third prong of the analysis, and (2) that the state had a justification in treating Plaintiff
19  differently under the fourth prong.  (Mot. for Summ. J. (#35) at 4-5, 17).  Each argument will
20  be discussed in turn.

21         **A.       The Motivating Factor in the Adverse Employment Actions**

22         The third prong of the analysis is purely a question of fact and the court must assume
23  the truth of the plaintiff's allegations. *Eng*, 552 F.3d at 1071.  To show that a genuine issue
24  of material fact exists on the question of whether the plaintiff's speech was a "substantial or
25  motivating factor" in the adverse employment action, a plaintiff may (1) introduce evidence that
26  the speech and adverse action were proximate in time, such that a jury could infer that the
27  action took place in retaliation for the speech; (2) introduce evidence that the employer
28  expressed opposition to the speech; or (3) introduce evidence that the proffered explanations

for the adverse action were false and pretextual. *Coszalter v. City of Salem*, 320 F.3d 968, 977 (9th Cir. 2003). There is no bright-line rule defining when a retaliatory action was taken "proximate in time," as the inquiry is fact intensive. *Id.* at 977-98. However, courts have found that acts taken up to eleven months after the speech occurred are within the range that may support an inference that the action was retaliatory. *Id.* (citing *Allen v. Iranon*, 283 F.3d 1070, 1078 (9th Cir. 2002)).

In addition to being motivated by the plaintiff's speech, to satisfy the third prong the action taken must also have been an "adverse employment action." "Adverse employment actions" are defined as "actions taken by the defendants [that are] reasonably likely to deter [the plaintiff] from engaging in protected activity under the First Amendment." *Coszalter*, 320 F.3d at 976.

Plaintiff alleges that at least four adverse employment actions were taken against him in retaliation for his speech. These include: (a) the written reprimand for his conduct on August 29, 2007; (b) the transfer when Plaintiff returned to work in the spring of 2008; (c) the decision to not promote Plaintiff in July of 2008; and (d) Plaintiff being disciplined for not complying with the residency requirement on September 4, 2009. (Am. Compl. (#20) at 2-3).

### 1.    The Written Reprimand for Plaintiff's Conduct on August 29, 2007

Plaintiff first argues the written reprimand for his conduct on August 29, 2007 was an adverse employment action motivated by Plaintiff's decision to exercise his free speech rights. (Am. Compl. (#20) at 2). It should initially be noted that a written reprimand constitutes an adverse employment action, as a disciplinary letter placed in the employee's permanent file is reasonably likely to deter the employee from engaging in protected activity under the First Amendment.

As to whether Plaintiff's protected actions were a motivating factor in the decision to issue the written reprimand, because of the proximity in time between the written reprimand and the time Plaintiff distributed the letters, a jury may infer that the reprimand was given in retaliation for Plaintiff's exercise of his First Amendment rights. Plaintiff sent the letters on August 29, 2007 and on that same day Chief Flock ordered Division Chief Frank Frievalt to

9

lead an investigation regarding the letter to determine whether any city or departmental rules were violated. (Haase Dep. (#35-1) at 18; Flock Dep. (#35-10) at 11, 16, 20; Finley Dep. (#35-10) at 21). Frievalt interrogated Plaintiff on September 5, 2007 and an investigative meeting was conducted on September 17, 2007 at which Plaintiff admitted to distributing the letters. (Am. Compl. (#20) at 2; Investigative Hearing (#35-9) at 21; Haase Dep. (#35-1) at 35-37). Plaintiff received a pre-disciplinary hearing notification letter on October 23, 2007, alleging Plaintiff may have violated four specific City of Sparks Administrative Rules, Civil Service Regulations and Sparks Fire Department Rules. (Ex. 12 (#35-4); Syverson Dep. (#35-11) at 7-8). On November 7, 2007, a pre-disciplinary hearing was held, and a formal disciplinary hearing was conducted on November 16, 2007. (Ex. 12 (#35-4); Ex. 13 (#35-4)). On November 21, 2007, Plaintiff was informed he would be disciplined. (Declaration (#38-3) at 2). Plaintiff then took annual and sick leave from December 2007 until approximately March or April of 2008. (*Id.*; Rybak Aff. (#35-11)). The first day he returned, he was given a formal written reprimand. (Declaration (#38-3) at 2).

Although the formal written reprimand was not delivered to Plaintiff until March or April, the decision was made to discipline Plaintiff less than three months after Plaintiff's letters were sent. (Ex. 13 (#35-4)). The approximate seven-month delay in delivering the reprimand was merely caused by the fact Plaintiff was absent from December until he returned in March or April, at which time the written reprimand was delivered. (Declaration (#38-3) at 2). As the above facts indicate, Defendants were also fully engaged in conducting interrogations and hearings from August 29th until November 21st to determine whether Plaintiff should be punished. Given that less than three months had elapsed from the time Plaintiff sent the letters until the time it was decided he would be disciplined, and as Defendants were actively pursuing his discipline throughout that period, the reprimand may be considered proximate in time such that a jury could infer that Plaintiff's speech was a motivating factor in issuing the reprimand. *See Coszalter*, 320 F.3d at 977.

Additionally, Plaintiff has shown a genuine issue of material fact exists on the question of whether Plaintiff's speech was a motivating factor to the alleged retaliatory action by

10

1   introducing evidence that the explanations proffered by Defendants for the adverse action
2   were pretextual. *See id.*  The written reprimand was issued on the justification that Plaintiff
3   had not been forthcoming to Captain Quick and because Plaintiff had improperly used fire
4   department equipment. (Ex. 14 (#35-4)).  Plaintiff however contends that he was not untruthful
5   because Captain Quick was informed that he would be using the truck to run errands, which
6   included a visit to City Hall for work related reasons.  (Investigative Hearing (#35-9) at 27).
7   The evidence is presently unclear as to what Captain Quick was told by Plaintiff, which is
8   essential to a determination of whether Plaintiff was "not forthcoming" and misused
9   equipment.[3]  If Plaintiff was not untruthful in communicating his intentions to Captain Quick
10  concerning the use of the brush truck, the trier of fact may be more inclined to find the
11  justifications for the reprimand were merely a pretext for punishing Plaintiff.

12      Finally, both Defendants may be found liable for Flock's decision to reprimand Plaintiff.
13  Chief Flock may of course be liable for his own actions.[4]  The City of Sparks however may also
14  be liable because, as discussed earlier, Chief Flock had been delegated decisionmaking
15  authority by the City of Sparks to establish rules and policies and to discipline employees.
16  Because Chief Flock had been delegated authority to discipline Plaintiff and it was ultimately
17  left to Chief Flock to determine whether Plaintiff would be punished for his actions, the City of
18  Sparks may be liable for Chief Flock's alleged retaliatory actions.  (Syverson Dep. (#35-11)

19
_____

20      [3] Plaintiff currently asserts that Captain Quick was told he would use the truck to go to
21  Kinkos. (Declaration (#38-3) at 3).  However, in Plaintiff's deposition he claimed Captain Quick
22  was not informed he would stop at Kinkos.  (Haase Dep. (#35-1) at 34, 35).  The report from
23  the investigative hearing states Captain Quick was told Plaintiff "had some errands to run."
24  (Investigative Hearing (#35-9) at 17).  The only issue of fact that is clear is that Captain Quick
25  was told Plaintiff would be going to City Hall.  (Haase Dep. (#35-1) at 34; Investigative Hearing
26  (#35-9) at 27).

27      [4] As discussed in detail below, Chief Flock may be liable for his own actions because
28  he is not entitled to qualified immunity in this case.

11

1   at 24 (noting the ultimate decision on whether to punish Plaintiff was left to Chief Flock)).

2       For these reasons, Plaintiff's claim that he was given a written reprimand for engaging

3   in a protected activity survives Defendants' motion for summary judgment.

4                    **2.   Plaintiff's Transfer**

5       Plaintiff also alleges that retaliation was a motivating factor behind his transfer from

6   Station 4 to Station 1 and that this transfer constitutes an adverse employment action.  (Am.

7   Compl. (#20) at 2).  Plaintiff was working at Station 4, but when he took leave in December for

8   an indefinite period of time, a firefighter with the necessary SCBA training and certification was

9   needed to fill in for him.  (Rybak Aff. (#35-11)).  A firefighter from Station 1 who had SCBA

10  training was then transferred to fill Plaintiff's position at Station 4.  (*Id.*).  When Plaintiff

11  returned, Division Chief Rybak decided to keep the newly transferred firefighter at Station 4

12  and send Plaintiff to Station 1.  (*Id.*).  Plaintiff has admitted that he suffered no loss of pay or

13  benefits as a result of this transfer.  (Haase Dep. (#35-1) at 128-29).  Plaintiff however

14  contends that the position was less desirable because it was a "rookie assignment."

15  (Declaration (#38-3) at 3).

16      The Court grants summary judgment in favor of Defendants on this allegation because

17  Plaintiff has failed to show that the transfer was an adverse employment action as required,

18  and because Chief Flock played no role in the transfer.  Plaintiff only alleges he believes the

19  position at Station 1 was for new hires and has failed to provide the Court with evidence that

20  his position at Station 1 was less desirable.  (Declaration (#38-3) at 4).  No evidence was

21  presented that the position at Station 1 was actually for new hires.  No evidence was provided

22  establishing that others perceived the assignment at Station 1 to be one for new hires or that

23  it was perceived to be less prestigious than other assignments.  Plaintiff has only made the

24  conclusory statement that he believes the position is one for new hires, which is not enough

25  to show a genuine issue of material fact exists on this matter.  *See Taylor v. List*, 880 F.2d

26  1040, 1045 (9th Cir. 1989).

27      Additionally, Plaintiff's argument fails because he has not shown Chief Flock played any

28  part in the transfer.  Although Plaintiff alleges in his amended complaint that "Flock caused

12

Plaintiff to be reassigned," Plaintiff has presented no evidence to establish Flock made the decision to transfer Plaintiff. (Am. Compl. (#20) at 2). Rather, Flock has stated that it was entirely Rybak's decision to reassign Plaintiff. (Flock Dep. (#35-10) at 33-34). Rybak also claims that it was his own decision to keep the transferred firefighter from Station 1 at Station 4 and transfer Plaintiff to Station 1 in his place. (Rybak Aff. (#35-11) at 2). Chief Flock cannot be personally liable because Plaintiff has not shown he played any role in the decision to transfer Plaintiff. As discussed above, the City of Sparks can only be liable if Chief Flock participated in the action as he is the City policymaking official for the fire department.[5] Because Plaintiff has failed to produce any evidence that Chief Flock caused Plaintiff to be transferred to Station 1, Defendants are entitled to summary judgment on this claim.

### 3.    Plaintiff Was Not Promoted

Plaintiff also alleges that retaliation for exercising his constitutional rights was a motivating factor in the decision not to promote Plaintiff. (Am. Compl (#20) at 3). In July of 2008 (nearly eleven months after Plaintiff distributed the letters) ten candidates—including Plaintiff—were interviewed for five apparatus operator positions. (Ex. 39 (#35-7)). The interview panel consisted of Division Chief William Finley, and Captains Michael Upson, Barry Hagen and Eric Millette. (*Id.*). Chief Flock was not on the panel and only approved their decision. (*See* Ex. 39 (#35-7)).

Whether Plaintiff's protected speech was a motivating factor of this adverse employment action is ultimately irrelevant because Plaintiff has failed to show that Chief Flock played any role in the decision to not promote Plaintiff. Chief Flock may only be personally liable for his own actions and Plaintiff has not shown or even alleged that Chief Flock caused

---

[5] Again, it should be noted that Plaintiff does not claim the City of Sparks has any municipal policy in place that impedes his constitutional rights, but solely relies on his claim that a policymaking official of the City (Chief Flock) acted to deprive Plaintiff of his constitutional rights as the basis of municipal liability. (Opp'n to Mot. for Summ. J. (#38) at 14-15).

13

1  
2  
3  
4  
Plaintiff to be passed over for promotion.  The decision to not promote Plaintiff was made by the four interviewers (which did not include Chief Flock).  (Ex. 39 (#35-7)).  Although Chief Flock ultimately concurred with their recommendations, Plaintiff has presented no evidence to suggest Chief Flock influenced the decision to not promote Plaintiff.  (*See* Ex. 39 (#35-7)).

5  
6  
7  
8  
9  
10  
11  
12  
13  
The City of Sparks also cannot be liable for the decision not to promote Plaintiff because Chief Flock played no part in the decision.  Because Plaintiff does not allege the adverse employment action was caused by a municipal policy in place, the City of Sparks can only be liable for decisions and actions of those with delegated policymaking authority.  *See Connick v. Thompson*, --- U.S. ----, 131 S.Ct. 1350, 1359 (2011).  The only person alleged by Plaintiff to have policymaking authority is Chief Flock.  (*See* Opp'n to Mot. for Summ. J. (#38) at 14-15).  As Plaintiff has failed to put forth any evidence that Chief Flock played a role in the decision not to promote Plaintiff, the City of Sparks cannot be liable, and Defendants are entitled to summary judgment on this claim.[6]

14  
### 4. Chief Flock's Rejection of Plaintiff's Proof of Compliance with the Residency Requirement

15  
16  
17  
18  
19  
20  
Finally, Plaintiff argues Chief Flock's decision to reject Plaintiff's proof of compliance with the Sparks Fire Department residency requirements was an adverse employment action motivated by Plaintiff's exercise of his First Amendment rights.  (Am. Compl. (#20) at 2-3).  In 2004, Sparks Fire Department Rule 3.1.2 required all Sparks Fire Department personnel to physically reside within 45 minutes of the nearest fire station.  (Ex. 42 (#35-7)).  This rule was

21  
22  
23  
24  
25  
26  
27  
28  
_____

[6] Plaintiff claims that one interviewer later apologized to Plaintiff, stating Plaintiff was not promoted because the interviewers considered the "Rumble incident."  (Declaration (#38-3) at 3).  Yet Plaintiff has failed to support this claim with anything except inadmissible hearsay.  (*See Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.").  Even if Plaintiff could support the allegation, Plaintiff's argument would still fail as he has not shown the interviewers were policymaking officials for the City of Sparks or that Chief Flock influenced the interviewers' decision.

1
2
3

changed on December 6, 2007 to allow for a 60 minute travel time. (Ex. 43 (#35-7)). On July 17, 2008, Chief Flock requested an update of physical addresses for all personnel, and Plaintiff provided him with his address of 153 Juniper Drive, Stateline, Nevada 89449. (*Id.*).

4
5
6
7
8
9
10
11
12
13

On September 4, 2008 Plaintiff was notified that he was in violation of Rule 3.1.2 because he resided more than 60 minutes from the nearest fire station and that he had 12 months to provide proof of compliance or he would be terminated. (*Id.*). On August 19, 2009, Plaintiff provided Defendants with a direction sheet from Yellowpages.com, which stated that the supposed 68 mile drive could be made in approximately 56.8 minutes.[7] (Ex. #44 (#35-7)). Chief Flock rejected this proof of compliance as others were unable to replicate it and gave Plaintiff a written reprimand and an additional six months to comply. (Ex. 46 (#35-7)). Plaintiff alleges that Chief Flock's rejection of his proof of compliance was an adverse employment action motivated by Plaintiff's decision to engage in his First Amendment rights. (Am. Compl. (#20) at 2-3).

14
15
16
17
18
19
20
21
22
23
24

Plaintiff however has both failed to show that retaliation was a motivating factor behind Defendants' failure to believe him and that the act was an adverse employment action. Plaintiff has neither alleged nor offered any evidence that the residency requirement in Rule 3.1.2 was applied in an uneven or discriminatory manner. No evidence was offered that other personnel had violated the residency requirement and that the Rule had not been similarly enforced against them. Plaintiff has also failed to show that he was in compliance with the Rule, but rather relies on conclusory statements that his route (which cannot be replicated) was accurate. (*See* Declaration (#38-3) at 3-4). Because Plaintiff has failed to show the residency requirement was applied in a discriminatory manner or that he was in compliance with the requirement, Plaintiff has failed to show that a genuine issue of material fact exists on this matter.

25
26
27
28

---

[7] Plaintiff's proof of compliance in itself is questionable. The actual distance from Plaintiff's home to the Fire Station is approximately 57 miles, not 68. (Ex. 48 (#35-7)). The detailed directions provided also do not add up to 68 miles. (*See* Ex. 44 (#35-7)).

**B.    The City of Sparks Did Not Have Adequate Justification for the Treatment**

Defendants also argue that the fourth prong of the analysis for First Amendment retaliation claims was not satisfied because the City of Sparks had an adequate justification for treating the employee different than the public at large. (Mot. for Summ. J. (#35) at 15-18). The government bears the burden of showing that "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006); *see also Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1106 (9th Cir. 2011).  The government must establish that its "legitimate administrative interests outweigh the employee's First Amendment rights." *Eng v. Cooley*, 552 F.3d 1062, 1071 (2009) (quoting *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004)).  These interests include promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service. *Connick v. Myers*, 461 U.S. 138, 150-51 (1983).

Defendants argue they had adequate justification in treating Plaintiff differently than the general public because trust and honesty are necessary to assure the efficient operation of a small paramilitary organization, such as the fire department. (Mot. for Summ. J. (#35) at 17-18).  Defendants also argue that Plaintiff's alleged false statements led to a brush truck being taken out of commission during the height of wildfire season, endangering the public. (*Id.* at 17).  Defendants propose these interests outweigh Plaintiff's interest in communicating the off-duty misconduct of his immediate supervisor. (*Id.*).

Defendants however have failed to establish an adequate justification for punishing Plaintiff on the basis of being untruthful or by creating a "trust issue."  Although honesty and trust are obviously very important in any paramilitary organization, a genuine issue of material fact exists as to whether Plaintiff was untruthful and whether Plaintiff's alleged untruthfulness was simply being used as a pretext to punish Plaintiff, as has been shown above.  Defendants claim that Plaintiff admitted to being untruthful by stating to Captain Quick that he "had some errands to run and that involved going to town to City Hall."  (Investigative Hearing (#35-9) at 27).  Yet Plaintiff asserts that he told Captain Quick that he would be taking the brush truck

1   to Kinkos and City Hall[8]—or at the very least, informed him that Plaintiff would be running

2   some errands which included going to City Hall—and Captain Quick gave his consent.

3   (Investigative Hearing (#35-9) at 27; Declaration (#38-3) at 3).  It is presently unclear exactly

4   what was stated to Captain Quick and whether that statement was untruthful.  Because it is

5   not clear that Plaintiff was untruthful and that Defendants' justification for punishing Plaintiff

6   was not simply a pretext, Defendants cannot rely on the importance of maintaining trust to

7   justify treating Plaintiff differently from the general public.

8        Defendants further argue that they were justified in treating Plaintiff differently from the

9   general public because Plaintiff improperly took a brush truck out of commission during the

10  height of wildfire season.  (Mot. for Summ. J. (#35) at 17).  This argument also lacks merit as

11  Captain Quick consented to Plaintiff's use of the truck.  (Haase Dep. (#35-1) at 33).  Whether

12  that consent was obtained improperly again goes back to the genuine issue of fact as to

13  whether Plaintiff was in fact untruthful.

14       Because Defendants have failed to prove any justification that would outweigh Plaintiff's

15  right to disseminate information that is a matter of public concern regarding a public employee

16  who allegedly harmed his best friend's daughter, the fourth prong of the analysis for First

17  Amendment retaliation is satisfied.

18  **III.    Qualified Immunity**

19       Finally, Defendants assert that Chief Flock may not be personally liable for any violation

20  because he is entitled to qualified immunity.  (Mot. for Summ. J. (#35) at 15-18).  Government

21  officials may be shielded from personal liability for their actions under the doctrine of qualified

22  immunity.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The doctrine of qualified immunity

23  protects government officials "from liability for civil damages insofar as their conduct does not

24  violate clearly established statutory or constitutional rights of which a reasonable person would

25  have known." *Id.*  Analyzing whether a government official is entitled to qualified immunity thus

26  involves two questions: (1) whether the facts alleged, in the light most favorable to the plaintiff,

27

28       [8] *See supra* note 2.

17

1 show the official violated a constitutional right; and (2) whether the right was clearly

2 established such that a reasonable government official would know the conduct was unlawful.

3 *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v.*

4 *Callahan*, 555 U.S. 223 (2009).  It is left to the court's sound discretion in deciding "which of

5 the two prongs of the qualified immunity analysis should be addressed first in light of the

6 circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.

7          As has already been shown above, viewed in the light most favorable to Plaintiff,

8 Plaintiff's constitutional rights may have been violated when he was given a written reprimand

9 shortly after exercising his right to free speech.  Consequently, the only question remaining

10 is whether the right was so clearly established that a reasonable government official would

11 know that the conduct was unlawful.

12          A clearly established right is one whose "contours . . . [are] sufficiently clear that a

13 reasonable official would understand that what he is doing violates that right."  *Anderson v.*

14 *Creighton*, 483 U.S. 635, 640 (1987).  A high degree of specificity is not necessary for a right

15 to be clearly established so long as the unlawfulness of the action is apparent in light of the

16 pre-existing law. *Francisco Jose Rivero v. City & Cnty. of San Francisco*, 316 F.3d 857, 864

17 (9th Cir. 2002).  The Supreme Court has clearly held from as early as 1968 that public

18 employees have a constitutional right to speak on issues of public importance without fear of

19 retribution. *Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968).  The Ninth Circuit has also

20 stated that "as early as 1983, it could hardly be disputed that an individual had a clearly

21 established right to be free of intentional retaliation by government officials based upon that

22 individual's constitutionally protected expression." *Hyland v. Wonder*, 117 F.3d 405, 410 (9th

23 Cir. 1997) (internal citation and quotation marks omitted).  Consequently, a reasonable officer

24 in Chief Flock's position would have known that he cannot retaliate against an employee

25 simply because that employee has engaged in his right to free speech.  Chief Flock is

26 therefore not entitled to qualified immunity.

27                                                  **CONCLUSION**

28          For the foregoing reasons, IT IS ORDERED that Defendants' motion for summary

judgment (#35) is granted in part and denied in part.  Defendants' motion is granted as to Plaintiff's claims that he was retaliated against in violation of 42 U.S.C. § 1983 by (a) being transferred, (b) not being promoted, and (c) having his proof of compliance regarding the residency requirement discredited.  Defendants' motion however is denied as to Plaintiff's remaining claim that the written reprimand for his conduct on August 29, 2007 was given in retaliation for engaging in his constitutional rights in violation of 42 U.S.C. § 1983.

DATED: This  23rd   day of February, 2012.

United States District Judge

19